Filing # 70339336 E-Filed 04/06/2018 10:29:32 AM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.: 16-2016-CA-0056-XXXX-MA
DIVISION: CV-C

JACQUALYNN S. MOORE,

      Plaintiff,

v.

LOREN Z. CLAYMAN, M.D.,
LOREN Z. CLAYMAN, M.D., P.A.,
a Florida corporation,
MARK A. CLAYMAN, M.D.,
ALLERGAN, INC.,
a foreign corporation,
ALLERGAN SALES, LLC,
a foreign limited liability company, and
ALLERGAN USA, INC.,
a foreign corporation,

      Defendants.

_____/

## AMENDED COMPLAINT

The Plaintiff, JACQUALYNN S. MOORE, sues the Defendants, LOREN Z.
CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., a Florida corporation, MARK A.
CLAYMAN, M.D., ALLERGAN, INC., a foreign corporation, ALLERGAN SALES, LLC,
a foreign limited liability company, and ALLERGAN USA, INC., a foreign corporation, and
alleges the following:

### GENERAL ALLEGATIONS

1.    This is an action for damages in excess of $15,000, exclusive of attorney's fees,
costs, and interest.

2.    All conditions precedent to the filing of this action have been performed or have

1

occurred.

3.     At all times material hereto, the Plaintiff, **JACQUALYNN S. MOORE** (hereinafter "Ms. Moore") was and is a resident of, and permanently domiciled in, Jacksonville, Duval County, Florida.

4.     At all times material hereto, the Defendants, **LOREN Z. CLAYMAN, M.D.** and **MARK A. CLAYMAN, M.D.** (hereinafter "Loren Z. Clayman" and "Mark A. Clayman," respectively), were and are residents of Jacksonville, Duval County, Florida.

5.     At all times material hereto, Loren Z. Clayman and Mark A. Clayman were and are physicians licensed to practice medicine by the State of Florida, who were and are practicing medicine in Duval County, Florida at their principal place of business located at 1801 Barrs Street, Suite 200, Jacksonville, Florida   32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

6.     At all times material hereto, Loren Z. Clayman and Mark A. Clayman held themselves out as specialists in the area of plastic surgery.

7.     At all times material hereto, the Defendant, **LOREN Z. CLAYMAN, M.D., P.A.** (hereinafter "Clayman PA"), was and is a Florida corporation, with its principal place of business at 1801 Barrs Street, Suite 200, Jacksonville, Florida   32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

8.     At all times material hereto, Loren Z. Clayman and Mark A. Clayman were and are employees, agents or apparent agents of Clayman PA; at all times material hereto, Loren Z. Clayman and/or Mark A. Clayman were and are acting in the course and scope of their employment, agency or apparent agency with Clayman PA.

9.     The Defendant, **ALLERGAN, INC.,** is a foreign corporation existing and

2

operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

10.     The Defendant, **ALLERGAN, INC.,** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

11.     The Defendant, **ALLERGAN, INC.,** may be reached for service of process in the State of Florida through its registered agent, CT Corporation System at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

12.     The Defendant, **ALLERGAN SALES, LLC,** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

13.     The Defendant, **ALLERGAN SALES, LLC,** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

14.     The Defendant, **ALLERGAN SALES, LLC,** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

3

15.    The Defendant, **ALLERGAN USA, INC.**, is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

16.    The Defendant, **ALLERGAN USA, INC.**, is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

17.    The Defendant, **ALLERGAN USA, INC.**, may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

18.    The Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.**, are hereinafter collectively referred to as "Allergan."

**PROCEDURAL ALLEGATIONS**

19.    On or about September 22, 2015, Ms. Moore caused to be mailed and served via Certified U.S. Mail, Return Receipt Requested, a *Notice of Intent to Initiate Litigation for Medical Malpractice* upon the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A.,** and **MARK A. CLAYMAN, M.D.,** as well as upon Dr. Clayman's Plastic Surgery Center and Miracle Spa, pursuant to the authority of Section 766.106, *Florida Statutes,* and Rule 1.650, *Florida Rules of Civil Procedure.* On or about September 23, 2015, the applicable *Notice* was received by the Defendant, **LOREN Z. CLAYMAN, M.D.,** or by representatives bearing a legal relationship to him.  On or about September 23, 2015, the

4

applicable *Notice* was received by the Defendant, **MARK A. CLAYMAN, M.D.**, or by representatives bearing a legal relationship to him. On or about September 23, 2015, the applicable *Notice* was also received by representatives bearing a legal relationship to Dr. Clayman's Plastic Surgery Center and Miracle Spa.

21.    By a letter dated November 20, 2015, the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A.**, and **MARK A. CLAYMAN, M.D.**, by and through their authorized representative, rejected Ms. Moore's claims.

22.    Ms. Moore has complied with all conditions precedent and pre-suit requirements for the filing of the instant lawsuit.

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

23.    In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants. In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

24.    Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

25.    In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time the company was one of the largest breast implant manufacturers in the world.

26.    As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical

devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

27.    After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

28.    In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled. Inamed contributed approximately $32,000,000 toward the settlement.

29.    In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.[1]

30.    On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant." On May 10, 2000, the FDA issued a letter approving the PMA.

31.    In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment. Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

32.    On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

33.    On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast

---

[1]    McGhan is currently serving the remainder of a 10-year prison sentence in Texas for wire fraud in relation to a scheme in which he attempted to use real estate investors' money for another breast implant business.

implants that are commonly referred to as "gummy bear" implants. The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

34.     In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

### ConfidencePlus Warranty

35.     With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty." According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

36.     Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[2], and $1,200 for the cost of replacement/revision surgery.

---

[2]     At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.

The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

### Clayman Defendants

37.    Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975. On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida. On October 2, 1978, he filed articles of incorporation for Clayman PA, with himself listed as both President and the Registered Agent of the new corporation.

38.    Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice. During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

39.    After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[3]

40.    By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan). The majority (if not all) of saline filled breast implants her purchased from Inamed/McGhan were Natrelle saline filled breast implants.

41.    Before Ms. Moore first consulted with Mark A. Clayman regarding breast augmentation, Loren Z. Clayman began making a higher than average number of warranty claims for patients with saline filled implants. In the vast majority of these claims, Loren Z. Clayman alleged that one or more saline implants spontaneously ruptured/deflated through no

---

[3]    Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

fault of the patient or him. Furthermore, he began making multiple, successive warranty claims for many of his patients.

42.     Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman continued using saline filled breast implants almost exclusively for breast augmentation procedures.

43.     After June 30, 2008, Loren Z. Clayman's son, Mark A. Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures. For patients who received saline filled breast implants, Mark A. Clayman also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him. Likewise, in many instances, Mark A. Clayman made multiple, successive warranty claims for patients, and he rarely if ever used silicone filled implants for breast augmentation procedures.

44.     **Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,516 pairs of Natrelle saline filled breast implants.**

45.     According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

46.     Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants. In accordance with these requirements, Allergan performs a *"Laboratory Analysis"* of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained. For the overwhelming

9

majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

47.     Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

### Jacqualynn S. Moore

48.     On or about March 25, 2014, Ms. Moore presented to Mark A. Clayman with complaints that her breasts were sagging, and that she wanted them to be firmer and "lifted." In response, Mark A. Clayman told her that there was no way to make her breasts less saggy, given all of the loose skin, without making her breasts bigger, a size D. He told her that he did not recommend a mastopexy or "lift procedure" because he claimed it would cause bad vertical scarring. Instead, he told her that he would perform an "internal lift" with her augmentation.

49.     On April 24, 2014, Ms. Moore presented to Mark A. Clayman for her first breast surgery. At that time, he performed breast augmentations, crescent pexy at the areola, and bilateral internal lifts. According to the product identification in the medical records, he implanted Allergan Natrelle Style 68 High Profile 400cc saline implants. The operative report does not state how much saline was used to fill the implants.

50.     On April 25, 2014, Ms. Moore returned to Mark A. Clayman and reported concerns about the size and position of her nipples. Mark A. Clayman's records do not note what if anything he did in response to her concerns. However, in response to her concerns, he told her that it was just swelling.

50.     On May 9, 2014, she returned to Mark A. Clayman for removal of the sutures from the previous surgery. At that time she complained of "extreme pain in [her] chest." In response, Mark A. Clayman asked her if she had engaged in "rough sex." He told her that her

"boobs" were "messed up" because she had bad posture, and that she should stand "like a porn star." When she asked if the sutures would come out, he told her that they would "fall off like a rat nibbling on her boobs," and that she should just let them "fall off." He provided her with prescriptions for a muscle relaxer and anti-inflammatory. During that same visit, Mark A. Clayman called in Loren Z. Clayman to examine Ms. Moore. Upon entering the room, Loren Z. Clayman said, "Let me see them titties," yanked off her shirt, and instructed her to "stand like a peacock."

51.    On October 15, 2014, Ms. Moore returned again to the office of Clayman PA with concerns about the appearance of her breasts, specifically, that they were sagging and were bigger than she had initially requested. On that date, she was seen by Loren Z. Clayman, who recommended a bilateral replacement surgery, which was scheduled. On that date, Loren Z. Clayman told her that it would take "a couple surgeries to get the look" she wanted. In a surgical estimate prepared that same date, Loren Z. Clayman documented that the right implant was "smaller," that she needed to have a bilateral replacement, and that she needed an internal lift. He promised her that the procedure would cost her nothing, but that she would need to pay Allergan $200 for another warranty of her breasts.

52.    On October 20, 2014, Ms. Moore presented to Clayman PA for her second surgery. In the surgical intake paperwork that Ms. Moore completed that day, she noted that her breasts were cup size DD to E, but that she only wanted them to be cup size D. According to the operative report, Loren Z. Clayman performed a bilateral re-augmentation, bilateral "circle pexy," and inframammary excision of skin. Loren Z. Clayman noted in the operative report that, upon dissecting down to the capsule of the right breast, he found the implant had a leak and was deflated. Both implants were removed and replaced with Allergan Natrelle Style 68 Medium

11

Profile 390cc saline implants. In the operative report, Loren Z. Clayman failed to note how much saline he used to fill the implants.

53.     According to Ms. Moore's medical records, Loren Z. Clayman made a warranty claim to Allergan on October 17, 2014 due "particles in valve" at the right implant. Loren Z. Clayman had Ms. Moore sign paperwork attesting that the warranty claim was being made to as a result of "particles in the valve." Later, Ms. Moore heard Clayman PA staff discussing that one of her implants was deflated. She asked Loren Z. Clayman about the deflation, and he told her that they had to claim deflation to get paid under the warranty without charging her. Later, Allergan paid Loren Z. Clayman $2,400 for the revision surgery.

54.     Upon receiving the returned implants, Allergan conducted a laboratory analysis of them. In its report, Allergan found no openings in the right implant shell, and further found that valve function was normal.

**COUNT I – CLAYMAN DEFENDANTS' MEDICAL NEGLIGENCE**

55.     Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

56.     At all times material, Mark A. Clayman and/or Loren Z. Clayman owed Ms. Moore a duty to exercise that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably careful physicians caring for a patient such as Ms. Moore.

57.     On or between March 25, 2014, and October 30, 2014, Mark A. Clayman and/or Loren Z. Clayman fell below the accepted and/or applicable standard of care in the treatment of Ms. Moore in one or more of the following ways:

(a).     By failing to properly document Ms. Moore's care, treatment, and surgery. The quality of the clinic and operative records are, at best, poor and completely

12

inadequate throughout Ms. Moore's care. None of the consultations or follow-up care records contains any direct documentation by Mark A. Clayman or Loren Z. Clayman of their encounters. The office notes do not contain detailed physical exams, detailed assessments/plans, or detailed documentation of the informed consent process. At a minimum, documentation should reflect the patient's subjective concerns, a review of pertinent medical history, physical assessments including direct measurements, and a synopsis of findings leading to the surgical recommendation.

(b).    By failing to have a documented discussion with the patient about implant size, incision placement, tissue plane, and implant type. In the records of Clayman PA no discussion of implant size is documented. Patients should have the opportunity to try different size implants and have a documented discussion regarding incision placement, tissue plane (pre/subpectoral), implant type, and implant size. In Ms. Moore's records, there are only discussions of implant type.

(c).    By failing to properly photograph Ms. Moore during the course of her medical care, treatment and surgeries. Clayman PA's photographic documentation in Ms. Moore's medical records is inadequate. At the very minimum, lateral and oblique views should be obtained. Standardization of photo background and lighting is also important and considered standard of care, as it allows not only a means of further objective assessment of the problem, but also provides a means of comparison over time. The few photos in the records are poorly reproduced "Polaroids" that only show a frontal view; backgrounds and lighting are inconsistent.

(d).    By failing to perform the appropriate surgery for the look that the patient sought. According to Ms. Moore, when she first presented to Mark A. Clayman, she told

him that she did not like the way her breast sagged, and that she wanted them "firmer and lifted"; she further states that he told her that the only way to make them "less saggy" was to make them bigger, bringing her from a size C to D. Further, she denies that she ever told him that she was concerned about a scar from an anchor mastopexy. Lastly, she states that even weeks after the surgery, her breasts were significantly larger (more than size D) that he had told her they would be.

(e).     By failing to plan an immediate or secondary mastopexy.

(f).     By failing to account for Ms. Moore's individual anatomy with adequate dimensional planning and preoperative sizing.

(g).     By placing large, high profile implants in a patient who needed a mastopexy in combination with her augmentation.

(h).     By failing to perform appropriate pre-operative planning.

(i).     By causing Ms. Moore to undergo a repeat operation and claiming that one of her implants had deflated, which placed her at an increased risk for surgical and anesthetic complications.

(j).     By failing to use or at least consider silicone gel implants after the first and second surgeries. The benefits of switching to the silicone implants include a negligible risk of implant rupture and deflation, as well as a softer, less painful, and more natural feel without rippling compared to overfilled saline implants.

(k).     By excessively overfilling Ms. Moore's breast implants.

(l).     By using an inappropriate anesthesia for the procedures being performed. Given that Loren Z. Clayman was attempting to implant the breast implants at a subpectoral plane, the standard of care was significantly breached with respect to the type

14

and quality of anesthesia provided to Ms. Moore to perform the initial subpectoral breast augmentation, and the subsequent revisions. Loren Z. Clayman used the sedation protocol of ketamine and versed, which was administered by a registered nurse and not a certified registered nurse anesthetist (CRNA). This is significant, as the difference between a certified registered nurse anesthetist and a registered nurse is the ability to manage an airway during the procedure. The lack of presence of someone who is trained to manage an airway under sedation led to significant under-sedation. Intravenous sedation should be deep enough to adequately perform the procedure without the patient recalling the procedure or experiencing intraoperative pain. Subpectoral breast augmentation should be performed under a general anesthetic, and, preferably, with the use of muscle paralytics. The inadequate intravenous sedation during Ms. Moore's procedures lead to an inadequate subpectoral plane and pocket development, and likely caused or contributed to the implants being malpositioned.

(m). By failing to be candid and honest with the patient. It is highly unlikely that Ms. Moore experienced the claimed deflation of her saline filled implants as described by Mark A. Clayman and/or Loren Z. Clayman. In its follow-up studies, Allergen reports spontaneous saline filled implant deflation rates of 2.7-6.8% at five years, and 10 to 13.8% at 10 years, averaging roughly a risk of 1.2% per year. Further, as noted in Allergan's *Laboratory Analysis* reports, there were no defects found in the valves or implant shells that would support a diagnosis of spontaneous deflation.

(n). By failing to use implants that were of a different brand, type, or volume than the implants used during the first surgery. If the first breast surgery proved to have been unsuccessful (as Mark A. Clayman and/or Loren Z. Clayman claimed) then it made

15

no sense for him to continue using the same implants in the later surgeries.

(o).    By failing to take measures to prevent infectious agents or materials from getting into the breast implants.

(p).    By failing to appropriately evaluate or assess her post-surgical complications or complaints.

(q).    By failing to appropriately treat her post-surgical complications or complaints.

(r).    By concealing or intentionally misrepresenting the cause of her post-surgical complications or complaints.

58.    As a direct and proximate result of above noted breach or breaches of the standard of care by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, Ms. Moore suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

59.    Furthermore, on one or more occasions Mark A. Clayman, Loren Z. Clayman, and/or employees, agents, or apparent agents of Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Moore and/or others that a saline implant that had been implanted in her body spontaneously deflated or ruptured; such fraud, concealment, or intentional misrepresentation caused Ms. Moore to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of the applicable standard of care by Mark A. Clayman, Loren Z. Clayman and/or Clayman PA.

16

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE**, demands judgment for damages against the Defendants, **MARK A. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D.** and/or **LOREN Z. CLAYMAN, M.D., P.A.**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT II – CLAYMAN DEFENDANTS' BREACH OF FIDUCIARY DUTY

60.     Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

61.     On or between March 25, 2014, and October 30, 2014, Ms. Moore was a patient of Mark A. Clayman and/or Loren Z. Clayman. By virtue of the physician-patient relationship, Mark A. Clayman and/or Loren Z. Clayman had fiduciary duties to Ms. Moore to not perform acts for his/their own pecuniary gain that were contrary to her welfare.

62.     Mark A. Clayman, Loren Z. Clayman and/or Clayman PA violated this/these fiduciary duty/duties to Ms. Moore in one or more of the following ways:

(a).    By claiming that one or more of her breast implants had deflated when in fact it/they had not.

(b).    By performing a second surgery on Ms. Moore that merely repeated the same procedure, without taking any actions to improve the condition of her breasts, which placed her at an increased risk for surgical and anesthetic complications.

(c).    By not performing the surgery that her physical condition actually required (mastopexy) in favor of surgery that took less time and skill, to save Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA time and money.

(d).    By performing a second surgery on her when he/they knew or should have known that he/they did not have the skill or competency to perform the second surgery within the standard of care.

17

(e).    By performing a second surgery on her so that Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA could recover a surgical fee from Allergan.

(f).    By performing surgery with inadequate anesthesia because it was cheaper, which in turn led to improper implant placement, as well as increased pain, discomfort, and anxiety.

63.    Furthermore, on one or more occasions Mark A. Clayman, Loren Z. Clayman, and/or employees, agents, and/or apparent agents of Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Moore and/or others that a saline implant that had been implanted in her body had spontaneously deflated; such fraud, concealment, or intentional misrepresentation caused Ms. Moore to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of Mark A. Clayman's and/or Loren Z. Clayman's fiduciary duties to her.

64.    As a direct and proximate result of Mark A. Clayman's and/or Loren Z. Clayman's breaches of his fiduciary duties to Ms. Moore, she suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE**, demands judgment for damages against the Defendants, **MARK A. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., and/or LOREN Z. CLAYMAN, M.D., P.A.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – CLAYMAN DEFENDANTS' VIOLATIONS OF FLORIDA DECEPTIVE

## AND UNFAIR TRADE PRACTICES ACT

65.    Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

66.    On one or more occasions between March 25, 2014, and October 30, 2014, Mark A. Clayman, Loren Z. Clayman, and/or employees, agents, and/or apparent agents of Clayman PA engaged in one or more of the following acts:

(a).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements soliciting patients for "Dr. Clayman's Plastic Surgery Center & Miracle Spa" when there is no organized entity or even a registered fictitious name for such an entity or organization.

(b).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements that represented that Mark A. Clayman and/or Loren Z. Clayman had the experience, competence and finesse to produce extraordinary surgical results, when in fact such representations were false.

(c).    Represented to Ms. Moore and/or others that a saline implant that had been implanted in her had spontaneously ruptured or deflated, when in fact it or they had not.

67.    The aforementioned acts of Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA were "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive practices" as contemplated by Section 501.204, *Florida Statutes*.

68.    Ms. Moore is a "consumer" and Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA were and are engaged in "trade or commerce," as both terms are defined in Section

501.203 (7) and (8), Florida Statutes.

69.     As a direct and proximate result of the aforesaid acts of Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, Ms. Moore suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

70.     Furthermore, as a direct and proximate result of the aforesaid acts of Loren Z. Clayman and Clayman PA, Ms. Moore spent monies in the amount of $3,750 or more, for medical and/or surgical care by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA that was of no value, and which caused her to need future medical care and incur related expenses to correct the damages done by said past medical and/or surgical care of Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA.

71.     As a result of the aforesaid acts of Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, Ms. Moore has retained or employed the undersigned law firm, and she has agreed to pay the firm a reasonable fee for its services in that regard.

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE,** seeks the following relief:

(a).     Judgment for damages against the Defendants, **MARK A. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D.,** and/or **LOREN Z. CLAYMAN, M.D., P.A.**

(b).     The court costs of this action, and attorney's fees pursuant to Sections 501.2105 and 501.211(2), *Florida Statutes.*

(c).     A declaratory judgment that one or more acts or practices of one or more of the Defendants violated the *Florida Deceptive and Unfair Trade Practices Act.*

(d).     An order enjoining one or more of the Defendants from engaging in the above noted acts or practices.

(e).     The Plaintiff further demands a trial by jury on all issues so triable.

## COUNT IV – CLAYMAN DEFENDANTS' FRAUD

72.     Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

73.     On one or more of the below occasions, Mark A. Clayman, Loren Z. Clayman, and/or employees, agents, and/or apparent agents of Clayman PA made the following false statements or representations, which were intended to conceal his/their inability to perform the breast augmentation procedures competently and within the standard of care, and which in fact misled Ms. Moore and/or caused her to respond in the following ways to her detriment:

(a).     On March 25, 2014, Mark A. Clayman represented to Ms. Moore that he was a competent plastic surgeon who could perform breast augmentation and related procedures in a reasonably competent manner that was within the standard of care. This representation was false because he was not in fact reasonably competent to perform the requested procedures within the standard of care. This representation caused Ms. Moore to choose Mark A. Clayman for breast surgery as opposed to other plastic surgeons.

(b).     On March 25, 2014, Mark A. Clayman represented that he knew the appearance that Ms. Moore wanted for her breasts, and that he could achieve that appearance through the planned surgery. In fact, whether Mark A. Clayman knew what appearance she desired or not, he did not have the ability or intention to perform the procedures necessary to provide her with the desired appearance (i.e. a mastopexy). This representation caused Ms. Moore to choose Mark A. Clayman for breast surgery as

21

opposed to other plastic surgeons who would have been able to provide her with the desired appearance.

(c). On March 25, 2014, Mark A. Clayman told Ms. Moore that there was no way to make her breasts less "saggy" without making her breasts bigger; that she would not want to have a mastopexy because such a procedure would leave bad vertical scarring; and that he would perform an "internal lift." These representations were false because a mastopexy could have been performed without giving her larger breasts; because a reasonably skilled plastic surgeon could have performed a mastopexy without causing bad scarring; and because there is no procedure called an "internal lift." These representations caused Ms. Moore to choose Mark A. Clayman for breast surgery as opposed to other plastic surgeons who would have been able to provide her with the desired appearance.

(d). On May 9, 2014, in response to complaints of extreme pain in her chest, Mark A. Clayman told Ms. Moore that her breasts were "messed up" because she had bad posture, and that she need to stand "like a porn star." This representation was false, as the problems with pain she was experiencing were the result Mark A. Clayman's breach of the standard of care and not a result of her posture. This representation caused her to continue treating with Mark A. Clayman and/or Clayman PA instead of a different plastic surgeon. As a result, Ms. Moore did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(e). On October 15, 2014, Ms. Moore returned to Clayman PA with concerns that her breasts were sagging and bigger than she had initially requested. On that date, Loren Z. Clayman told her that there was a problem in one of her implants, and that she

needed at least one more surgery with bilateral replacement of her implants to correct the problem so she could obtain the look that she sought. Loren Z. Clayman later repeated a similar representation in his operative report dated October 20, 2014. In fact, Ms. Moore did not have a problem in one of her implants, nor did Loren Z. Clayman have the intention or ability to resolve any of the problems that she was having with her breasts. These representations caused Moore to conclude that her problems with her breasts were not the result of malpractice by Mark A. Clayman and/or Loren Z. Clayman, but instead were the result of defective implants. As a result, Ms. Moore did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for potential medical negligence.

(f).    In a surgical estimate prepared and given to Ms. Moore on October 15, 2014, Loren Z. Clayman represented to Ms. Moore that he would perform an "internal lift" upon her. These representation was false because there is no procedure called an "internal lift." This representation caused Moore to agree to undergo surgery with Loren Z. Clayman, and she did not seek another opinion from a different plastic surgeon, nor did she seek legal counsel for potential medical negligence against Mark A. Clayman.

(g).    In the process of having Ms. Moore sign the informed consent paperwork on or about October 20, 2014, Loren Z. Clayman and/or a Clayman PA employee, agent, and/or apparent agent reported that she experienced a rupture, leak, or deflation at one of her breast implants. In fact, she did not have a rupture, leak, or deflation of her breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Moore to conclude that the problems she was experiencing with her breasts were not the result of Mark A.

23

Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Moore did not seek an opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(h). On or between October 17, 2014 and October 20, 2014, Loren Z. Clayman completed documentation for a warranty claim to Allergan; in the documentation he asserted that Ms. Moore's right breast implant was deflated, ruptured, or leaking due to a "particles in valve." In fact, Ms. Moore's right breast implant did not have a deflation, rupture, or leak, nor "particles in the valve." These representations caused Ms. Moore to later conclude that her problems with her breasts were not the result of malpractice by Mark A. Clayman, but instead were the result of defective implants. As a result, Ms. Moore did not seek an opinion from a different plastic surgeon, nor did she seek legal counsel for potential medical negligence.

74. As a result of the above false statements or representations, Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA were able to continue collecting money in relation to the medical and surgical care of Ms. Moore, Ms. Moore did not seek an opinion from a different plastic surgeon, and/or Ms. Moore delayed seeking legal counsel for potential medical negligence.

75. As a direct and proximate result of the above noted false statements or representations by Mark A. Clayman, Loren Z. Clayman, and/or employees, agents, and/or apparent agents of Clayman PA, Ms. Moore suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of

24

life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

76.     Furthermore, as a direct and proximate result of the above noted false statements or representations by Mark A. Clayman, Loren Z. Clayman, and/or employees, agents or apparent agents of Clayman PA, Ms. Moore spent monies in the amount of $3,750 or more for medical and/or surgical care by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses for medical and surgical care to correct the damage done by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA.

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE**, demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A.**, and **MARK A. CLAYMAN, M.D.**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT V – CLAYMAN DEFENDANTS AND ALLERGAN'S CONSPIRACY TO COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

77.     Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

78.     On or before March 25, 2014, Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty.

79.     Ms. Moore re-alleges and incorporates by reference paragraphs 61 through 63 as the allegations of conduct by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Mark A. Clayman, Loren Z. Clayman,

and/or Clayman PA to Ms. Moore.

80.    Ms. Moore re-alleges and incorporates by reference paragraphs 73 through 74 as the allegations of fraud upon Ms. Moore committed by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA.

81.    Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a).    Continuing to sell Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA saline filled breast implants after March 25, 2014, despite the following:

(1).    Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(2).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(b).    Failing to report Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA to the appropriate authorities before March 25, 2014, despite the following:

(1).    Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(2).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(c).    Paying the warranty claim of Mark A. Clayman, Loren Z. Clayman,

26

and/or Clayman PA, without requesting further corroboration, in relation to the right Natrelle saline filled breast implant that Mark A. Clayman placed into Ms. Moore on April 24, 2014, and which Loren Z. Clayman surgically removed on October 20, 2014, despite the following:

>  (1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Mark A. Clayman into Ms. Moore on April 24, 2014, and explanted from Ms. Moore by Loren Z. Clayman on October 20, 2014, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the October 20, 2014 surgery was not necessary as a result of a failed breast implant;

>  (2).    Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for Natrelle saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

>  (3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

82.    As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, and also by Allergan, Ms. Moore suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

83.    Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Mark A. Clayman, Loren Z. Clayman, and/or

Clayman PA, and also by Allergan, Ms. Moore has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE**, demands judgment for damages against the Defendants, **MARK A. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VI – ALLERGAN AIDING AND ABETTING FRAUD
## AND/OR BREACH OF FIDUCIARY DUTY

84.    Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

85.    Ms. Moore re-alleges and incorporates by reference paragraphs 61 through 63 as the allegations of conduct by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA to Ms. Moore.

86.    Ms. Moore re-alleges and incorporates by reference paragraphs 73 through 74 as the allegations of fraud upon Ms. Moore committed by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA.

87.    Allergan, through its employees or agents, knew that Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, was committing fraud upon Ms. Moore, and/or breaching a fiduciary duty owed to Ms. Moore, due to the following:

(a).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Mark A. Clayman into Ms. Moore on April 24, 2014, and explanted from Ms. Moore by Loren Z. Clayman on October 20, 2014, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the October 20, 2014 surgery was not necessary as a result of a failed breast implant;

(b).    Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan for Natrelle saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(c).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

88.    Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA in committing fraud against Ms. Moore, and/or breaching a fiduciary duty owed to Ms. Moore, in one or more of the following ways:

(a).    Continuing to sell Mark Clayman, Loren Z. Clayman, and/or Clayman PA saline filled breast implants after March 25, 2014;

(b).    Failing to report Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA to the appropriate authorities before March 25, 2014;

29

(c).    Paying the warranty claim of Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, without requesting further corroboration, in relation to the right Natrelle saline filled breast implant that Mark A. Clayman placed into Ms. Moore on April 24, 2014, and which Loren Z. Clayman surgically removed on October 20, 2014;

89.    As a direct and proximate result of the substantial assistance provided by Allergan to Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, Ms. Moore suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

90.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA, Ms. Moore has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Mark A. Clayman, Loren Z. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VII – ALLERGAN'S STRICT LIABILITY FOR DEFECTIVE PRODUCTS

91.    Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

30

92.    Allergan designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  left and right Natrelle Style 68 High Profile 400cc saline filled implants with the serial numbers 19251461 and 19089485, respectively, that were implanted into Ms. Moore on April 24, 2014, and explanted from Ms. Moore on October 20, 2014; left and right Natrelle Style 68 390cc saline filled implants with serial numbers 18559441 and 19353992, respectively, that were implanted into Ms. Moore on October 20, 2014.

93.    At all times material, Allergan expected the aforesaid saline filled breast implants to reach, and each implant did in fact reach, consumers in the State of Florida, including Ms. Moore, without substantial changes in the condition in which they were sold or distributed.

94.    At all times material, the aforesaid saline filled breast implants were being used in the manner intended or, based upon all of the circumstances, reasonably expected by Allergan.

95.    At all times material, one or more of the aforesaid saline filled breast implants was/were in fact defective and in an unreasonably dangerous condition at the time it/they were placed into the stream of commerce, and when put to its/their reasonably anticipated use, in one or more of the following ways:

a.    <u>Design</u>

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

31

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).    Prior to April 24, 2014, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    Manufacture

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shell and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from

inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

96.    The defective condition of one or more of the aforesaid saline filled breast implants subjected patients receiving the breast implants to infection or rupture/deflation, which exceeded the benefits of the products, and for which safer products were available.    This defective condition made one or more of the aforesaid saline filled breast implants unreasonably dangerous when put to use as intended or reasonably expected by Allergan.

97.    The defective condition of one or more of the aforesaid saline filled breast implants directly caused or contributed to cause Ms. Moore to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VIII – ALLERGAN'S PRODUCT NEGLIGENCE

98.    Ms. Moore re-alleges and incorporates by reference paragraphs 1 through 54.

33

99.    Allergan was and is the entity that designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  left and right Natrelle Style 68 High Profile 400cc saline filled implants with the serial numbers 19251461 and 19089485, respectively, that were implanted into Ms. Moore on April 24, 2014, and explanted from Ms. Moore on October 20, 2014; left and right Natrelle Style 68 390cc saline filled implants with serial numbers 18559441 and 19353992, respectively, that were implanted into Ms. Moore on October 20, 2014; accordingly, at all times material Allergan owed one of more of the following duties to the patients who received the implants in surgeries:

(a).    to properly design, assemble, and manufacture the aforesaid Natrelle saline filled breast implants so that none of them created an unreasonable risk of harm, bodily injury, or death to their users or consumers;

(b).    to provide labels and packaging materials that adequately warned implanting surgeons and the using public of the risks and dangers associated with the aforesaid Allergan Natrelle saline filled breast implants, including but not limited to the risk of their valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents, as well as the risk of the valves allowing saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and/or

(c).    to conduct adequate testing on the aforesaid Natrelle saline filled implants before releasing them into the stream of commerce to ensure that they were reasonably safe for their intended use.

100.    On or before April 24, 2014, Allergan knew or should have known that the

aforesaid Natrelle saline filled breast implants posed an unreasonable risk of harm, bodily injury, or death to its users, the patients who had them implanted into them.

101.    Allergan breached the duties it owed to its users, the patients who had Natrelle saline filled breast implants implanted into them, in one or more of the following ways:

a.    Design

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).    Prior to April 24, 2014, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    Manufacture

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

102.    Allergan's breach of the duty or duties it owed to users of Natrelle saline filled breast implants, including Ms. Moore, directly caused or contributed to cause Ms. Moore to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **JACQUALYNN S. MOORE**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

36

## CERTIFICATE OF REASONABLE INVESTIGATION

The undersigned counsel hereby certifies that he has made a reasonable investigation as permitted by the circumstances which have given rise to a good faith belief that grounds exist for the bringing of this action.

/s/ Christopher Shakib_____
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:     (904) 632-2424
Facsimile:      (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: aashley@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff


/s/ Leslie A. Goller_____
**Leslie A. Goller, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:     (904) 632-2424
Facsimile:      (904) 632-5049
Primary Email: lgoller@terrellhogan.com
Secondary Email: lkipp@terrellhogan.com
Florida Bar No.: 0393932
Attorney for the Plaintiff